CSG EXPLORATION COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Williams Natural Gas Company; Midwest Gas Users Association; Amoco Production Company; The Kansas Power & Light Company; Affiliated Gas Producers; Union Gas System, Inc.; Intervenors.

AMOCO PRODUCTION COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Midwest Gas Users Association; Affiliated Gas Producers; Williams Natural Gas Company; CSG Exploration Company; Intervenors.

ARKLA EXPLORATION COMPANY; ANR Production Company; CIG Exploration, Inc.; Coastal Oil & Gas Corp.; Columbia Gas Development Corp.; Enron Oil & Gas Company; Meridian Oil, Inc.; Sonat Exploration Company; Transco Exploration Company; Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Amoco Production Company; Williams Natural Gas Company; Midwest Gas Users Association; CSG Exploration Company; The Kansas Power & Light Company; Intervenors.

Nos. 88–2548, 88–3015 and 89–9520.

United States Court of Appeals, Tenth Circuit.

April 18, 1991.

As Amended July 12, 1991.

Douglas E. Nordlinger (Douglas G. Robinson, Skadden, Arps, Slate, Meagher & Flom, Washington, D.C., and Darrel A. Kelsey, Ronald A. Skoller, and Robert N. Price, CSG Exploration Co., with him on the briefs), Skadden, Arps, Slate, Meagher & Flom, Washington, D.C., for petitioner CSG Exploration Co.

James D. Senger (Thomas A. Gottschalk and Stephen A. Herman, Kirkland & Ellis, Washington, D.C., and M.J. Keating and Michael E. Rigney, Chicago, Ill., with him on the briefs), Kirkland & Ellis, Washington, D.C., for petitioner-intervenor Amoco Production Co.

Charles M. Darling, IV (Drew J. Fossum, Baker & Botts, Washington, D.C., Kirk W. Weinert, Coastal Oil & Gas Corp., ANR Production Co., CIG Exploration, Inc., Dennis M. Ulak, Enron Oil & Gas Co., Philip C. Wrangle, Sonat Exploration Co., Houston, Tex., Gregory W. Jones, Arkla Exploration Co., Shreveport, La., Lowell Williams and Camille N. Tarics, Columbia Gas Development Corp., Gavin H. Smith and John R. Riherd, Meridian Oil, Inc., and Robert L. McIntyre, Transco Exploration Co., Houston, Tex., with him on the briefs), Baker & Botts, Washington, D.C., for petitioners-intervenors Affiliated Gas Producers.

Michael E. Small, Wright & Talisman, Washington, D.C., on the briefs, for intervenor Williams Natural Gas Co.

Joel M. Cockrell (William S. Scherman, Gen. Counsel, Jerome M. Feit, Sol., Joseph S. Davies, Deputy Sol., on the brief), for respondent F.E.R.C.

Before MOORE, SETH, and TACHA, Circuit Judges.

TACHA, Circuit Judge.

Petitioner CSG Exploration Company (CSG) seeks review of the orders of the Federal Energy Regulatory Commission (FERC) in *Northwest Cent. Pipeline Corp.*, 44 FERC ¶ 61,200 (1988) (order on remand vacating prior orders and setting complaint for hearing) and *Northwest Cent. Pipeline Corp.*, 44 FERC ¶ 61,434 (1988) (order granting in part and denying in part rehearing and denying motion for

late intervention).[1] Intervenor Affiliated Gas Producers (AGP)[2] also seeks review of FERC's order denying its motion for clarification and reconsideration. *Northwest Cent. Pipeline Corp.*, 45 FERC ¶ 61,305 (1988). In these orders, FERC articulated tests for determining: (1) whether there is arm's length bargaining between parties in the formation of a contract for the sale of gas, thereby satisfying one of the prerequisites for incentive pricing under section 107(b) of the Natural Gas Policy Act (NGPA), 15 U.S.C. § 3317(b); and (2) the proper price for such gas if there is no arm's length bargaining. Because we conclude the issues presented are moot, we dismiss for lack of jurisdiction.

## I.  FACTS

### A.  Statutory Background

In enacting the NGPA in 1978, Congress created a new framework for the regulation of natural gas that "comprehensively and dramatically changed the method of pricing natural gas produced in the United States." *Public Serv. Comm'n v. Mid-Louisiana Gas Co.*, 463 U.S. 319, 322, 103 S.Ct. 3024, 3027, 77 L.Ed.2d 668 (1983). Congress identified four categories of gas as high-cost gas: (1) deep gas (below 15,000 feet), (2) gas from geopressured brine, (3) occluded natural gas produced from coral seams, and (4) gas produced from Devonian shale. *See* §§ 107(c)(1)–(4), 15 U.S.C. §§ 3317(c)(1)–(4). In section 107 (c)(5), 15 U.S.C. § 3317(c)(5), Congress delegated authority to FERC to expand the definition of "high-cost natural gas" to include any gas that is "produced under such other conditions as the Commission determines to present extraordinary risks or costs." In addition, Congress gave FERC the authority to determine a maximum lawful price for high-cost gas "to provide reasonable

incentives" for production. *See* § 107(b), 15 U.S.C. § 3317(b).

In Order No. 99, FERC promulgated regulations, effective July 16, 1979, that create an incentive price under section 107(c)(5) for gas produced from tight formations. A producer can collect this incentive price only if the contract for the sale of the gas contains a "negotiated contract price," which FERC defines as

> any price established by a contract provision that specifically references the incentive pricing authority of the Commission under section 107 of the NGPA, by a contract provision that prescribes a specific fixed rate, or by the operation of a fixed escalator clause.

18 C.F.R. § 271.702(a)(1) (1990). Such a provision operates only if it is the result of arm's length bargaining between the parties to the contract. *See Pennzoil Co. v. FERC*, 671 F.2d 119, 124–25 (5th Cir.1982).

### B.  The Wyoming Exploration and Development Program

In 1975 and 1976 the Wamsutter and Moxa partnerships were formed between Amoco Production Company and CSG, a natural gas producer then affiliated with Williams Natural Gas Company. After the NGPA was enacted, all contracts for the sale of gas to Williams by Amoco provided the price of the gas would be the maximum lawful rate then authorized by the NGPA. These contracts also provided that if FERC thereafter were to prescribe a higher rate, then that rate could be collected.

On March 17, 1981, Williams agreed to amend fifty-one contracts it previously had executed with Amoco as general partner in the Wamsutter and Moxa partnerships. Language satisfying the negotiated contract price requirement in Order No. 99 was added to each of these contracts. The

---

1. The Kansas Power & Light Company, Midwest Gas Users Association, and the Kansas Corporation Commission also filed a petition for review of these orders, appeal No. 88–2893. The issue raised in that petition, however, is unrelated to the issues raised here. It is therefore the subject of a separate opinion to be issued by this court.

2. AGP is an *ad hoc* organization of gas producers affiliated with interstate pipelines. Member companies include Arkla Exploration Company, Columbia Gas Development Corporation, Enron Oil and Gas Company, ANR Production Company, CIG Exploration, Inc., Coastal Oil and Gas Corporation, Meridian Oil, Inc., Sonat Exploration Company, and TXP Operating Company (successor to Transco Exploration Company).

1981 contract amendments specifically referred to section 107(c)(5) and provided for payment of the tight formation incentive price retroactive to July 16, 1979.

### C. Proceedings Below

In 1983 the Midwest Gas Users Association (Midwest) filed a complaint with FERC, arguing in part that the 1981 contract amendments did not meet the negotiated contract price requirement of Order No. 99. Midwest asserted these amendments were not the result of arm's length bargaining because the Wamsutter and Moxa partnerships were affiliated with Williams through a corporate relationship between CGS and Williams at the time these amendments were made. The gas therefore did not qualify for the section 107(c)(5) incentive price. Several of Williams' customers joined in challenging the rights of the partnerships to collect the incentive price and Williams' right to pass that price through to its customers. FERC determined the higher prices established in the contract amendments were true negotiated contract prices. *Northwest Cent. Pipeline Corp.*, 32 FERC ¶ 61,471 (1985); *Northwest Cent. Pipeline Corp.*, 34 FERC ¶ 61,301 (1986).

Various parties petitioned for review of this decision to the United States Court of Appeals for the District of Columbia Circuit. That court found FERC had erred in relying exclusively on the statutory test of affiliation in determining whether the parties engaged in arm's length bargaining. *Midwest Gas Users Ass'n v. FERC*, 833 F.2d 341, 353–55 (D.C.Cir.1987). It remanded the case, directing FERC to formulate a test for arm's length bargaining that considered all relevant facts, including whether the parties had diverse economic interests relating to the payment of tight formation incentive prices. *Id.* at 355.

On remand, FERC concluded the proper test for determining whether the parties had engaged in arm's length bargaining and could have thus agreed to a negotiated contract price was "whether the purchaser and seller have sufficiently distinct economic interests that the buyer's interest in the negotiations are aligned with those to whom it resells the gas, and not with the interests of the seller." *Northwest Cent. Pipeline Corp.*, 44 FERC ¶ 61,200, at 61,-719 (1988). FERC held it would treat parties meeting the definition of "affiliates" under section 2(27) as incapable of arm's length bargaining without further inquiry into the degree to which their economic interests coincide. *Id.* Additionally, FERC stated that

> [i]f the purchaser has an economic incentive to pay a higher price or agree to other terms more favorable than necessary to provide a reasonable incentive to the seller for the production of the gas, there can be no arm's length bargaining.
>
> . . . .
>
> . . . [E]ven if parties are not affiliated, as the Commission found in this case, the Commission will carefully scrutinize the relationship of the purchaser and seller where there are reasonable grounds to believe that their economic interests overlap to the extent that the price and terms agreed to do not reflect competitive market forces.

*Id.* FERC then applied this common economic interest test to the relationship between Williams and the partnerships, concluding they were affiliates "because the economic interests of the purchaser and the sellers coincided to such an extent that they did not and could not have engaged in arm's length bargaining." *Id.*

FERC went on to note that even if it found there was no arm's length bargaining, Williams still would not be required to refund any portion of the incentive price to its customers if the requirements of the affiliated entities limitation in section 601(b)(1)(E), 15 U.S.C. § 3431(b)(1)(E), were

satisfied. *Id.* at 61,719–20 & n. 16. This provision imposes a market price test on purchases from affiliates by providing that the gas a pipeline produces itself can qualify for the incentive price if it "does not exceed the amount paid in comparable first sales between persons not affiliated with such pipeline." *Id.* at 61,719 (quoting 18 C.F.R. § 271.702(a)(4) (1990)).

"Comparable first sales" is not defined in the NGPA. In *El Paso Natural Gas Co.*, 23 FERC ¶ 61,216 (1983), FERC established a "rule of reason" to be applied on a case-by-case basis for determining comparability. FERC decided the most logical basis upon which to judge the reasonableness of the price a pipeline paid affiliated producers is to compare these purchases to those from nonaffiliated producers. *Id.* at 61,-449.

Four years later, however, FERC abandoned *El Paso's* "rule of reason" test in favor of the weighted average cost of gas [WACOG] test [3] in *Tennessee Gas Pipeline Co.*, 38 FERC ¶ 61,306 (1987). Noting the affiliated entities limitation provides "a Congressional mandate for strict regulatory oversight of pipeline purchases from affiliated entities," *id.* at 61,999, FERC determined it no longer would compare only a pipeline's affiliated purchases with its nonaffiliated purchases in determining comparable first sales. It also would compare those purchases with comparable third-party nonaffiliated purchases. FERC announced it would look to factors such as the geographic location of the sales, the NGPA pricing category involved, and the timing of executed contracts in determining whether a particular third-party nonaffiliated sale was comparable to the affiliated sale in question. *Id.* at 62,000. FERC also stated "the passthrough should be denied if *any* payment to an affiliate exceeded the lower of the average price paid in either nonaffiliated or third party transactions." *Id.*

In its August 1, 1988 order in the present case, FERC directed the administrative law judge (ALJ) to conduct an evidentiary hearing to determine by applying the WACOG test whether the affiliated entities limitation had been satisfied in this case.

[W]e will set this matter for hearing to establish the price for tight formation gas under the limitation applicable to pipeline production. This determination should be made by reference to the weighted average price [WACOG] paid by purchasers in comparable non-affiliated transactions.

*Northwest Cent. Pipeline Corp.*, 44 FERC ¶ 61,200, at 61,719–20.

Two months later, FERC issued an order granting rehearing in part and denying rehearing in part. *Northwest Cent. Pipeline Corp.*, 44 FERC ¶ 61,434 (1988). FERC reversed its earlier finding that there was no arm's length bargaining between the Pipeline and the partnerships. It ruled "the parties should be given an opportunity at the hearing to demonstrate the existence of arm's length bargaining." *Id.* at 61,-374–75. FERC reaffirmed that the common economic interest test should govern the ALJ's ultimate ruling on this issue. *Id.* at 61,375. The agency declined to grant rehearing of its decision that the ALJ should apply the WACOG test if she concluded there was no arm's length bargaining between the parties. *Id.*

In the same order, FERC declined to permit AGP to intervene in these evidentiary hearings to challenge the common economic interest test and the WACOG test. It ruled AGP had no direct economic interest warranting participation. *Id.* at 61,376. In a separate order, FERC denied AGP's motion for clarification and rehearing of the agency's previous rulings concerning the application of the WACOG and common economic interest tests in this case. *Northwest Cent. Pipeline Corp.*, 45 FERC ¶ 61,305 (1988).

---

**3.** "Weighted average cost of gas" refers to a cost computed by averaging together the cost of each unit of gas. Thus, if the pipeline bought a large amount of gas at low cost and a small amount at high cost, in averaging its purchases more proportional weight is given to the cheap volumes than to the expensive volumes to achieve an accurate picture of the pipeline's overall purchasing pattern.

Three petitions for judicial review of FERC's rulings in this case were filed in several circuits. These appeals were ultimately consolidated in this court. This court ordered FERC to permit AGP to intervene in the ongoing evidentiary hearing for the purpose of challenging the application of the WACOG and common economic interest tests. *CSG Exploration Co. v. FERC*, Nos. 88–2548 *et al.* at 4 (10th Cir. October 19, 1989).

FERC issued an order on December 6, 1989 granting AGP's motion to intervene. *Northwest Cent. Pipeline Corp.*, 49 FERC ¶ 61,339 (1989). Following oral argument, all the parties to this litigation except AGP entered into a settlement agreement, which was approved by FERC on February 8, 1991. All FERC proceedings relating to this action have been terminated.

CSG and APG now assert their challenges to the facial validity of the WACOG test were not resolved by the settlement. AGP also contends its challenge to the common economic interest test as a generic rule has not been addressed. CSG and AGP urge this court to consider whether the generic rules are contrary to the express terms and mandate of the NGPA. We conclude these challenges are not ripe for review and dismiss these appeals for lack of jurisdiction.

## II. DISCUSSION

### A. Mootness

Because a moot issue is not a case or controversy within the meaning of Article III of the United States Constitution, this court does not have jurisdiction to review such a question. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 546, 96 S.Ct. 2791, 2796–97, 49 L.Ed.2d 683 (1976). The federal courts cannot issue advisory opinions or "decide questions that cannot affect the rights of litigants before them." *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971).

The parties agree the challenges to the WACOG and common economic interest tests as applied by FERC to the specific facts of this case are moot as a result of the settlement agreement. CSG and AGP, however, allege a live controversy remains between them and FERC concerning the prospective application of these standards. They assert the threat the WACOG and common economic interest test will be applied places affiliated producers at an economic disadvantage.

We cannot say whether the questions before us are moot. *See Capitol Technical Serv., Inc. v. Federal Aviation Admin.*, 791 F.2d 964, 968–69 (D.C.Cir.1986); *Better Government Ass'n v. Department of State*, 780 F.2d 86, 90–92 (D.C.Cir.1986). CSG and AGP have not demonstrated how the impact of these rules is "felt immediately by those subject to it in conducting their day-to-day affairs." *Toilet Goods Assoc., Inc. v. Gardner*, 387 U.S. 158, 164, 87 S.Ct. 1520, 1524–25, 18 L.Ed.2d 697 (1967). The record before us is devoid of any evidence demonstrating present injury to affiliated producers resulting directly from the tests will be applied prospectively. We determine the justiciability of this case based on whether the issues presented are ripe for review.

### B. Ripeness

1. The Standards for Determining Ripeness

■ Section 506(a)(4) of the NGPA, 15 U.S.C. § 3416(a)(4), provides for judicial review of FERC orders:

Any person who is a party to a proceeding under this chapter aggrieved by any final order issued by the Commission in such proceeding may obtain review of such order in the United States Court of Appeals.

Although this provision does not expressly impose a requirement of ripeness, we will dismiss an appeal unless FERC's actions are ripe for review. *See National Ass'n of Regulatory Util. Comm'rs v. FERC*, 823 F.2d 1377, 1381–82 (10th Cir.1987).

In *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967), the Supreme Court held the issue of ripeness of an agency's action requires a court to evaluate both "the fitness of the issues for judicial decision and

the hardship to the parties of withholding court consideration." The Court articulated four important factors courts should consider in making this determination: (1) whether the challenged agency action constitutes "final agency action" within the meaning of section 10 of the Administrative Procedure Act, 5 U.S.C. § 704; (2) whether the issues presented are purely legal; (3) whether the challenged agency action has or will have a direct and immediate impact upon the party seeking review; and (4) whether resolution of the issue will foster, rather than impede, effective enforcement and administration by the agency. *Id.* at 149–54, 87 S.Ct. at 1515–18; *see also Pennzoil Co. v. FERC,* 645 F.2d 394, 398 (5th Cir.1981); *ECEE, Inc. v. FERC,* 611 F.2d 554, 556–57 (5th Cir.1980).

The Fifth Circuit Court of Appeals has applied this four-part test to a fact situation similar to the present case. In *Pennzoil Co.,* the petitioners challenged FERC Order No. 77, which contains guidelines for the interpretation of pricing clauses in contracts for the sale of natural gas by producers to pipelines. 645 F.2d at 396. Order No. 77 directs the ALJ to apply these standards in determining the proper rate to be paid under the parties' contract. It also states the standards elaborated in the opinion are refinements of previous rules and will be followed in other proceedings involving the question of contractual authorization for collection of NGPA rates. *Pennzoil Co.,* 645 F.2d at 396–97.

The petitioners in *Pennzoil Co.* sought judicial review of the standards for contract interpretation contained in Order No. 77 before they were applied by the ALJ. Based on the *Abbott Laboratories* test, the court in *Pennzoil Co.* concluded the standards were not ripe for review. *Id.* at

398–400. We apply the same rationale employed by the Fifth Circuit in *Pennzoil Co.* and conclude these challenges to the facial validity of the WACOG and common economic interest tests are not ripe for review.

### 2. Application of the *Abbott Laboratories* Test

■ The *Abbott Laboratories* test first directs us to consider whether the challenged agency action is a final action within the meaning of section 10 of the Administrative Procedure Act, 5 U.S.C. § 704. The Supreme Court has explained that

> the relevant considerations in determining finality are whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action.

*Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970). The inquiry is a "flexible" one that necessarily takes into account "pragmatic considerations." *See FTC v. Standard Oil of California,* 449 U.S. 232, 240, 101 S.Ct. 488, 493, 66 L.Ed.2d 416 (1980). An "order of the agency is final for purposes of review when it imposes an obligation, denies a right, or fixes some legal relationship as a consummation of the administrative process." *Cities Serv. Gas Co. v. Federal Power Comm'n,* 255 F.2d 860, 863 (10th Cir.), *cert. denied,* 358 U.S. 837, 79 S.Ct. 61, 3 L.Ed.2d 73 (1958).

■ We agree the WACOG test and the common economic interest test are binding generic rules.[4] This conclusion, however,

---

4. FERC admits these two tests are binding generic rules. FERC has consistently applied the WACOG test since it was first announced in *Tennessee Gas Pipeline Co.,* 38 FERC ¶ 31,306 (1987). *See, e.g., Kentucky W. Va. Gas Co.,* 46 FERC ¶ 61,018, *reh'g denied,* 48 FERC ¶ 61,071 (1989); *National Fuel Gas Supply Corp.,* 44 FERC ¶ 61,293, *reh'g denied,* 45 FERC ¶ 61,269 (1988); *Panhandle E. Pipeline Co.,* 44 FERC ¶ 61,246 (1988), *reh'g denied,* 46 FERC ¶ 61,189 (1989). After the *Tennessee* decision, FERC issued a Notice of Proposed Rulemaking in which

it proposed a new regulation to implement the affiliated entities limitation. Revisions to the Purchased Gas Adjustment Regulations, FERC Stats. & Regs. [Proposed Regs., 1982–1987] ¶ 32,442, at 33,492 (1987). FERC deferred action on its proposed rulemaking a few months later. Order No. 483, III FERC Stats. & Regs. [Regs. Preambles] ¶ 30,778, at 30,902 (1987). No further action on that rulemaking has been taken. At oral argument of this case, FERC admitted this rulemaking has been abandoned.

does not necessarily lead to the conclusion these agency decisions are ripe for review. The court in *International Union, United Automobile, Aerospace & Agricultural Implement Workers v. Brock*, found " 'an agency's interpretation of its governing statute, with the expectation that regulated parties will conform and rely on this interpretation' " is a final agency action. 783 F.2d 237, 248 (D.C.Cir.1986) (quoting *Independent Bankers Ass'n of Am. v. Smith*, 534 F.2d 921, 929 & n. 27 (D.C.Cir.), *cert. denied*, 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 141 (1976)). It noted, however, that "announcements of general policies may not be ripe for review until they are actually applied against specific plaintiffs." *Id.* at 249 (citing *Alascom, Inc. v. FCC*, 727 F.2d 1212 (D.C.Cir.1984); *Baltimore Gas & Elec. Co. v. ICC*, 672 F.2d 146 (D.C.Cir. 1982)). Such is the case here. We find the other three factors in the *Abbott Laboratories* test counsel against judicial review of the WACOG and common economic interest tests at this time. *See, e.g., Friends of Keesville, Inc. v. FERC*, 859 F.2d 230, 235–36 (D.C.Cir.1988) (final order not ripe for review because issue may not require adjudication).

The second part of the *Abbott Laboratories* test directs us to question whether the issues presented are purely legal. A court is faced with a purely legal issue when the parties challenge a rule generally rather than its application to a specific set of facts. *See Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. at 1515; *Pennzoil Co.*, 645 F.2d at 398.

Here, CSG and AGP are not contesting specific applications of the WACOG test. Instead, they have launched a full scale attack on this test as a general rule to be applied in later cases. The two arguments advanced against the WACOG test are purely legal. First, CSG and AGP contend the test is contrary to the letter and spirit of the NGPA. They assert courts interpreting the NGPA have held its incentive pricing scheme applies equally to affiliated and nonaffiliated producers. *See, e.g.,*

*Public Serv. Comm'n of New York v. Mid–Louisiana Gas Co.*, 463 U.S. 319, 103 S.Ct. 3024, 77 L.Ed.2d 668 (1983). Because the WACOG test is based on weighted averages, it effectively eliminates the possibility that prices for affiliate production can ever be on par with prices for nonaffiliate production. Second, CSG and AGP argue the WACOG test is unworkable in the day-to-day business world.

The role of the reviewing court is to resolve the purely legal issues presented by the parties by reference to the relevant statutory language and applicable legal precedent. The WACOG test is FERC's interpretation of "comparable first sales" in the NGPA's affiliated entities limitation in section 601(b)(1)(E), 15 U.S.C. § 3431(b)(1)(E). An examination of the language of this provision, its legislative history, and relevant legal precedent provides no clear answer to the question whether the agency abused its discretion in formulating this test. These questions only can be answered based on a fully developed factual record. Judicial review of these challenges to the WACOG test therefore must be deferred until a later time.

CSG and AGP admit the WACOG test involves the application of complex standards to a specific factual situation. In such circumstances, courts have found judicial review should be reserved until the challenged regulation is actually applied in a particular case by the agency. The court in *Pennzoil Co.* noted:

the guidelines in Opinion No. 77 are complex. A specific guideline is often qualified as "generally" calling for a certain result and frequently requires a balancing of several factors. These complexities and subtleties reveal that our task will be aided when we see these guidelines applied to a specific area rate clause and a developed record.

645 F.2d at 398; *see also Pacific Gas & Elec. Co. v. Federal Power Comm'n*, 506 F.2d 33, 49 (D.C.Cir.1974) (judicial review of FPC order concerning natural gas curtailment inappropriate because insufficient

The agency indicated it considered the WACOG test a binding generic rule. FERC also stated

the common economic interest test would be applied in the future as a generic rule.

evidentiary record would not permit meaningful review).

CSG and AGP urge this court to consider the previous situations when FERC has applied the WACOG test. It asserts the experience in these cases demonstrate the limitations of the test. The records in these cases, however, are not before this court and we cannot consider them in making our decision.

The two arguments advanced by AGP against the common economic interest test are also purely legal. First, AGP contends this test is contrary to the policies underlying the NGPA. Section 2(27) of the NGPA, 15 U.S.C. § 3301(27) states "[t]he term 'affiliate', when used in relation to any person, means another person which controls, is controlled by, or is under common control with, such person." AGP asserts FERC adopted a new definition of affiliation when it formulated the common economic interest test. FERC now determines affiliation based on coincidence of economic interest rather than economic control as mandated by the statute. AGP argues FERC will use this broad definition of affiliation to avoid the strictures of the fraud and abuse standard in section 601(c)(2) of the NGPA, 15 U.S.C. § 3431(c)(2).[5] It thus will be able to regulate affiliated producers and pipelines in a manner not previously authorized by the NGPA. Second, AGP contends FERC acted arbitrarily and capriciously because its decision to adopt the common economic interests test was not supported by substantial evidence.

Again, we conclude AGP's challenges to the common economic interests test cannot be resolved in the absence of a fully developed factual record. The language and legislative history of section 107 of the NGPA, 15 U.S.C. § 3317, the statutory provision under which the negotiated contract requirement and common economic interest test were promulgated, reveal no clear answer to the question whether the agency abused its discretion in formulating the test. Until there is before us a case in which the common economic interest test has been actually applied, we cannot say with certainty either that it is inconsistent with the letter or spirit of the NGPA or that FERC acted arbitrarily and capriciously in formulating this test.

The present case is similar to *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), a companion case to *Abbott Laboratories*. There the Supreme Court concluded that although the parties had presented purely legal issues for review, the regulations at issue were not ripe because the review would stand on a "much surer footing in the context of a specific application." *Id.* at 163–64, 87 S.Ct. at 1524. Similarly, we conclude judicial review of the WACOG and common economic interest test should be delayed until they are applied in a specific context.

The *Abbott Laboratories* test next directs us to consider whether the challenged agency decisions have or will have a direct and immediate impact on CSG and AGP. An agency order is not ripe for review unless it has "some substantial effect on the parties which cannot be altered by subsequent administrative action." *Public Serv. Co. of New Mexico v. Federal Power Comm'n*, 557 F.2d 227, 233 (10th Cir.1977) (citing *Atlanta Gas Light Co. v. Federal Power Comm'n*, 476 F.2d 142, 147 (5th Cir.1973)); *see also Friends of Keesville, Inc.*, 859 F.2d at 235–36; *Rocky Mountain Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 741–43 (10th Cir.1982); *Pennzoil Co.*, 645

**5.** This section provides that FERC may not deny any interstate pipeline recovery of any amount paid with respect to any purchase of natural gas if such amount is just and reasonable and such recovery is not inconsistent with any requirement of any rule under 15 U.S.C. §§ 3341–42 unless FERC determines that the amount paid was excessive due to fraud, abuse, or similar grounds. In the original action filed with FERC against Williams, Midwest and other Williams customers also asserted the amount paid by Williams to the partnerships was excessive due to fraud and abuse. In its September 30, 1985 declaratory order, FERC ruled Williams could pass through the incentive price to its customers under section 601(c)(2), subject to the record developed in related antitrust proceedings, *In re Wyoming Tight Sands Antitrust Cases*, Nos. 85–2349 *et al.* (D.Kan.1990). The parties to the antitrust case recently have settled the matter out of court.

F.2d at 399–400; *Pacific Gas & Elec. Co.,* 506 F.2d at 48–49. CSG and AGP retain the burden of proving by substantial evidence they will suffer injury if the WACOG and common economic interest tests are not reviewed immediately. *See Friends of Keesville,* 859 F.2d at 235.

CSG and AGP argue the WACOG test and the common economic interest tests are causing present injury. They contend the threat these tests will be applied in future cases places affiliated producers at an economic disadvantage. CSG asserts this threat forces all producers who are affiliated with interstate pipelines to charge significantly less for gas than unaffiliated producers charge. Similarly, AGP contends the threat the common economic interest test will be applied renders affiliated gas producers unattractive business partners for parties unaffiliated with interstate pipelines. Unaffiliated producers, unwilling to risk disadvantageous pricing rules under the common economic interest test, will avoid associating with affiliated producers.

CSG and AGP rely on this court's decision in *Rocky Mountain Oil & Gas* to support their argument that business-related economic uncertainty alone establishes ripeness. 696 F.2d at 741–42. In that case, however, petitioners offered substantial documented evidence supporting their contention that the challenged regulation had had a chilling effect on gas exploration. *Id.* As noted above, CSG and AGP have offered this court only unsupported assertions that the threat of future application of these tests has had a negative impact on affiliated gas producers. These assertions are insufficient to allow us to conclude the tests are ripe for review. *See Tennessee Gas Pipeline Co. v. FERC,* 736 F.2d 747, 750–51 (D.C.Cir.1984) (hypothetical nonrecoverable losses insufficient to prove economic injury).

CSG and AGP have failed to demonstrate they will suffer irreparable injury if we do not examine the validity of the WACOG and common economic interest tests at this time. We are not convinced AGP will be foreclosed from challenging these tests at a later time. *Cf. National Ass'n of Regulatory Util. Comm'rs,* 823 F.2d at 1381–82 (order ripe for review if petitioner will have no later opportunity for challenging agency action); *Sunray DX Oil Co. v. Federal Power Comm'n,* 351 F.2d 395, 400 (10th Cir.1965) (same).

Finally, we turn to the fourth part of the *Abbott Laboratories* test: Whether resolution of the issues will foster, rather than impede, effective enforcement and administration by the agency. We agree with FERC that an attempt to review the WACOG and common economic interests tests without the benefit of a fully developed factual record would invade the province of the agency. In such circumstances, "the agency should be given the first chance to ... apply that expertise." *McKart v. United States,* 395 U.S. 185, 194, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1969).

Based on the *Abbott Laboratories* test, we conclude the challenged orders are not ripe for review. We therefore DISMISS these appeals for lack of jurisdiction.